1    Name: Christopher Jones

2    Address: 836, 69th Street,
          San Diego, California 92114
3    Telephone Phone:
          (619) 518-7877
4    Email:
5    CJones711notrouble@gmail.com

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11                                          Case No.:    '21 CV 847   WQHWVG

12   Christopher Jones, a Single Man ,         (assigned at time of filing)

13                          Plaintiff(s),

14   v.                                      **COMPLAINT**

15

16   County of San Diego, et. al.      ,

17

18                          Defendant(s).

19

20   **I.    RELATED CASES**

21        a.    Do you have other Civil Case(s) in this or any other federal court?

22              ☐ Yes      ☒ No

23        b.    If yes, please list the case numbers here:

24

25   **II.   STATEMENT OF CLAIM** *(Briefly state the facts of your case. Describe how*

26        *each defendant is involved, and tell what each defendant did to you that caused*

27        *you to file this suit against them. Include names of any other persons involved,*

28        *dates, and places.)*

                                    1

**FILED**

May 03 202[1]
1:23 pm

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/ dominicf        DEPUTY

1.     In 1995, following a trial by jury, Jurors convicted Plaintiff in the County of San Diego, California, City of El Cajon Superior Court of felony Murder, Second-degree, on a weak self-defense claim. While still in state prison, Plaintiff filed his Post-Conviction habeas petitions advancing his Sixth Amendment Right was violated by the ineffective assistance Plaintiff received when his Counsel, Defendant Thomas Kelley failed to investigate and present a mental-health based defense at Trial.

2.     After exhausting state remedies, and arguing back and forth for over Ten years in the United States District Court for the Southern District of California, On January 21, 2020, The U.S. Magistrate Judge Michael S. Berg filed his Report and Recommindation (R&R), Recommending that Plaintiff's Federal Petition for Writ of Habeas Corpus be granted on grounds of Ineffective Assistance of Counsel for failure to investigate, and then present, a mental health defense.

3.     Subsequently thereafter, On October 19, 2020, the Honorable Jeffery T. Miller, U.S. District Judge, adopted on behalf of the court the U.S. Magistrate's R&R as its own, and issued his own opinion when granting Plaintiff's Petition and "discharging [Plaintiff] of all Consequence of his second degree Murder Conviction

1   in the San Diego Superior Court Case No. ECRI1253."

2

3   4.   On February 4, 2021, the San Diego Superior
4   Court reduced Plaintiffs second degree Murder to
5   manslaughter, in violation of Cal. PC section 192,
6   with the personal use of a firearm enhancement per
7   PC section 12022.5(a). with Credit for time Served.
8   Because the time Served" exceeded the maximum
9   commitment, The excess credits were applied to
10   Plaintiff's parole term and his parole was terminated
11   forthwith. (Attached and marked exhibit "A", is a
12   Conformed copy of the February 4, 2021, Stipulation
13   and Order to Resentence Plaintiff Per Federal Court
14   order.)

15

16   5.   In this action, and for the record, prior to
17   Plaintiff's Federal Petition being Submitted on the
18   merits for the magistrate Judge's determination with
19   respect to his R&R, both Counsels in an attempt to
20   re-Solve Plaintiff's Federal Petition, Plaintiff was
21   requested and offered a plea agreement, Reducing
22   Plaintiff's Second degree murder Conviction to
23   manslaughter with time Served. Plaintiff refused
24   and allowed the process to run its Course.

25

26   6.   In short, Plaintiff's 1995 Conviction was
27   Called into question, Vacated by a Federal Court's
28   issuance of Plaintiff's Federal Petition in October

Page 2a

\* EXHIBIT A \*

SCR11253    DA# P5468401    **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

☐ CENTRAL  ☒ EAST  ☐ NORTH  ☐ SOUTH

DATE 02/04/21 _____ AT 1:30 _____.M.    _Status Conference_

PRESENT: HON POLLY H. SHAMOON _____ JUDGE PRESIDING, DEPARTMENT ____9____

CLERK C. AMI _____ REPORTER RINDY ORMROD _____ CSR# 6278

REPORTER'S ADDRESS: P.O. BOX 120128, SAN DIEGO, CA 92112

THE PEOPLE OF THE STATE OF CALIFORNIA    S. WALLER - VIA AUDIO VIDEO
                                                        DEPUTY DISTRICT ATTORNEY / DEPUTY ATTORNEY GENERAL
VS.

JONES, CHRISTOPHER    W. ANTRIM - VIA AUDIO VIDEO
            DEFENDANT            ATTORNEY FOR DEFENDANT PD / APD / OAC / RETAINED

VIOLATION OF COUNT 1 - PC187(a) _____ P.O. _____

ENH(S) COUNT 1 - PC12022.5(a) _____ INTERP. _____ OATH ON FILE / SWN.

PRIOR(S) _____ LANGUAGE _____

DEFENDANT ☐ PRESENT    ☐ SELF REPRESENTED    ☒ NOT PRESENT    ☐ NOT PRODUCED  PC922  Retrial: 3-8-21  PQAm D-11

☐ PROB. REV.  ☐ DEFENDANT ADVISED OF RIGHTS AND ADMITS / DENIES A VIOLATION OF PROBATION  _is vacated_  ☐ WAIVES HEARING.
☐ PROBATION IS / REMAINS: FORMALLY / SUMMARILY  ☐ REVOKED  ☐ REINSTATED  ☐ MODIFIED  ☐ CONT.  ☐ SAME CONDITIONS  ☐ TERMD.  ☐ EXT. TO:
☐ JUDGMENT  ☐ WAIVES ARRAIGNMENT.  ☐ ARRAIGNED FOR JUDGMENT.  ☐ IMPOSITION / EXECUTION OF SENTENCE IS SUSPENDED.
☒ COMMITMENT IS: ☒ DENIED  ☐ GRANTED____ YEARS (FORMAL / TO COURT) TO EXPIRE _____  ☐ CONVERTS TO PROB. TO COURT _____
☐ COMMITMENT TO SHERIFF FOR ____ DAYS. STAYED TO _____  ☐ PENDING SUCCESSFUL COMPL. OF PROBATION.  ☐ PAROLE NOT TO BE GRANTED.
☐ PERFORM ____ DAYS PSP.  ☐ HOURS VOL. WORK AT NONPROFIT ORG.  ☐ SUBMIT PROOF TO PROBATION / COURT BY _____
☐ 4TH AMENDMENT WAIVER:  IMPOSED. / REMAINS IN EFFECT. / DELETED.  ☐ PROTECTIVE ORDER:  ISSUED. / REMAINS IN EFFECT. / MODIFIED. / TERMINATED.
☐ FURTHER CONDITIONS ARE SET FORTH IN PROBATION ORDER.  ☐ WORK FURLOUGH, REPORT: _____ TO 5800 OVERLAND AVE. STE 190, SAN DIEGO 8:00 A.M.
☐ COMMITMENT TO ☒ CA. DEPT. OF CORRECTIONS & REHAB.  ☐ DIVISION OF JUVENILE JUSTICE  ☐ SAN DIEGO COUNTY SHERIFF (PC1170(h)/2057) ON
COUNT _1_  CODE & NO. PC192 _____ FOR _____ LOWER / MIDDLE / UPPER / INDETERMINATE TERM OF ____11____ YEARS MONTHS / TO LIFE.
☐ EXECUTION OF SENTENCE CONCLUDING ____ DAYS ____ MONTHS ____ YEARS OF SENTENCE IS SUSPENDED, DURING WHICH TIME THE DEFT. SHALL BE SUBJECT
TO MANDATORY SUPV. BY THE PROB. DEPT. (PC1170(h)(5)(b)). TERMS AND CONDITIONS SET FORTH IN THE ORDER GRANTING MANDATORY SUPV. (CRM-255).
☐ PER PC1170(d)  ☐ PER W11737  ☐ PRINCIPAL COUNT.  ☐ STIPULATED SENTENCE.  ☐ NO EARLY RELEASE OF ANY TYPE AUTHORIZED.
☐ SENTENCE PER PC667(b)-(i)/1170.12.  ☐ NOTICE OF FIREARMS PROHIBITION GIVEN PER PC29805.
☐ NO VISITATION PER PC1202.05. VICTIM IS UNDER 18 YRS. OF AGE.  DA TO COMPLY WITH NOTICES.
☒ TESTING:  ☐ COMPLIANCE WITH PC296 VERIFIED.  ☒ DNA (PC296)  ☐ HIV (PC1202.1)
☐ DEFENDANT ADVISED RE: PAROLE / APPEAL RIGHTS.  ☐ REGISTER PER ☐ PC290  ☐ HS11590  ☐ PC457.1  ☐ PC186.30
☐ DEFENDANT TO PAY: FINE OF $_____ INCLUDING PENALTY ASSESSMENT, PLUS THE FOLLOWING:
☐ INSTALLMENT/ACCOUNTS RECEIVABLE FEE (PC1205(e)) $_____.  ☐ DRUG PROGRAM FEE (HS11372.7) $_____.
☐ LAB ANALYSIS FEE (HS11372.5) $_____.  ☐ THEFT FINE (PC1202.5) $_____.
☐ COURT OPERATIONS ASSESSMENT (PC1465.8) $_____.  ☐ CRIM JUSTICE ADMIN FEE (GC29550 et seq.) $_____
☐ CRIMINAL CONVICTION ASSESSMENT (GC70373) $_____.  ☐ SEX OFFENDER REG. FINE (PC290.3) $_____.
☐ PROB. HAVING BEEN FORMALLY REVOKED, THE PREVIOUS REST. FINE OF $_____, SUSP. PER PC1202.44, IS NOW DUE.
☐ RESTITUTION FINES: $_____ (PC1202.4(b)) PLUS 10% (PC1202.4(l)) FORTHWITH (PC2085.5)
    $_____ (PC1202.44/PC1202.45) SUSPENDED UNLESS PROBATION/PAROLE/SUPERVISION REVOKED.
☐ RESTITUTION TO VICTIM(S) PER P.O.'S REPORT / RESTITUTION FUND (PC1202.4(f)) $_____ / IN AN AMOUNT
TO BE DETERMINED.  ☐ JOINT & SEVERAL.  ☐ AT COMBINED RATE OF $_____ PER MONTH TO START 60 DAYS AFTER RELEASE / ON _____.
☐ REPORT TO  ☐ PROBATION  ☐ REVENUE & RECOVERY  ☐ COURT COLLECTIONS  ☐ FORTHWITH.  ☐ WITHIN 72 HRS. OF RELEASE FROM CUSTODY.
☐ PROCEEDINGS SUSPENDED  ☐ PER PC1368, MENTAL COMPETENCY. (SEE BELOW FOR DATES OF EXAMINATION AND HEARING.)
☐ FUTURE HEARINGS  WAIVERS: ☐ TIME FOR JUDGMENT.  ☐ PRESENCE FOR RESTITUTION HRG.  ☐ REFERRED FOR DIAGNOSTIC EVAL. PER PC1203.03.  / W707.2.
_____ CONT. TO / SET FOR _____ AT _____ IN DEPT. _____ ON MOTION OF COURT / DDA / DEFT. / PROB. OFFICER.
☐ TO BE HEARD CONCURRENTLY WITH PRELIMINARY HEARING IN CASE _____  ☐ TO TRAIL CASE(S) _____
☐ CUSTODY STATUS  ☐ DEFENDANT REMANDED TO CUSTODY OF SHERIFF  ☐ WITHOUT BAIL.  ☐ WITH BAIL SET AT $_____
☐ MAY BE RELEASED TO REP. OF PD / PROB./APPROVED RES. TREATMENT PROG. ☐ STAY / SERVE BAL. OF CUST. ☐ WHEN BED AVAIL. ☐ AFTER _____ CUSTODY.
☒ DEFT. ORDERED RELEASED FROM CUSTODY  ☐ ON PROBATION.  ☐ ON OWN / SUPERVISED RECOGNIZANCE.  ☐ ON DEJ.  ☐ ON MANDATORY SUPERVISION.
☐ DEFENDANT TO REMAIN AT LIBERTY  ☐ ON BOND POSTED $_____.  ☐ ON PROBATION.  ☐ ON DEJ.  ☐ ON OWN / SUPERVISED RECOGNIZANCE.
☐ BONDS / WARRANTS  ☐ BENCH WARRANT TO ISSUE, BAIL SET AT $_____  ☐ COUNSEL REPORTS NO CONTACT WITH DEFENDANT.
☐ SERVICE FORTHWITH.  ☐ ORDERED WITHHELD TO _____.  ☐ BENCH WARRANT ISSUED / ORDERED _____ IS RECALLED / RESCINDED.
☐ DECLARATION OF NON-COLLUSION & RE-ASSUMPTION OF LIABILITY FILED.  ☐ BAIL FORF. IS SET ASIDE.  ☐ BAIL ☐ REINSTATED ☐ EXONERATED ☐ FORFEITED
☐ UPON PAYMENT OF COURT COST $_____ WITHIN 30 DAYS.  ☐ COST WAIVED.  BOND AMT $_____  BOND NO. _____
BOND COMPANY _____ AGENT _____
☐ OTHER  ☐ ALL PROPERTY IMPOUNDED, SEIZED, OR HELD IN CUSTODY IN THIS CASE TO BE DISPOSED OF PER POSSESSING AGENCY'S POLICY.
☐ PROBATION: PREPARE SUPPLEMENTAL REPORT. / SUBMIT POST-SENT. REPORT TO CDCR PER PC1203c.  ☐ SEE ATTACHED MINUTES FOR ADDITIONAL ORDERS.
☐ CONCURRENT WITH / CONSECUTIVE TO: _____    CLERK: ☒ REGISTRAR OF ACTIONS  ☐ DMV ABSTRACT B.A.C.____

Count 1 - PC187(a)/PC12022.5(a) and previous sentence are vacated. Charge is reduced to show Count 1 - PC192, PC12022.5(a) allegation
nunc pro tunc to 07/24/1995. As to count 1 enhancement PC12022.5(a) - middle term of 4 years. Total term = 15 years nunc pro tunc to
08/21/1995. Defendant to be terminated from parole forthwith due to excess credits. Stipulation & order to resentence is signed and filed.

Date: _____ ATTEST A TRUE COPY, Clerk of the Superior Court by _____, Deputy

Distribution by _____ on _____ to  JAIL   DEFT.   ATTY.   PROS.   PROB.   R&R   Other: _____

SDSC CRM-002B (Rev. 4/14)    **FELONY MINUTES – PRONOUNCEMENT OF JUDGMENT**

**DAYS CREDIT FOR TIME SERVED**

| | |
|---|---|
| 7832 | LOCAL |
| _____ | STATE INST. |
| _____ | PC4019  [2/2] |
| _____ | PC4019  [2/2] |
| _____ | PC4019 (b)(1)/(c)(1)  [2/2] |
| _____ | PC4019(b)(2)/(c)(2) limited [2/4] |
| _____ | PC2933(e)(1)  [1/1] |
| _____ | PC2933(c)(3) dissipated [2/4] |
| 1174 | PC2933.1  [15%] |
| _____ | RESIDENTIAL TREATMENT |
| 9006 | TOTAL CREDITS |

2020 and the chief Judge, Honorable Miller, noted in relevant part his order adopting the magistrate's R&R, That Petitioner has overcome Stricklands high Bar and demonstrated that his trial counsel's failure to Conduct an adequate investigation or present a mental health base defense was unreasonable.

7.    Even after this court granted Plaintiff's Petition, and before the state court reduced Plaintiff's Sentence, once again, the State through defense counsel attempted to have Plaintiff plead before the court to Manslaughter before reducing his Sentence. Plaintiff refused to plead, and advised both State Counsels to follow the Federal Courts order, because that order did not mention anything about Plaintiff having to accept a plea in Order for the State to reduce Plaintiff's Sentence.

8.    In claim one, and with all due respect to Counsel Kelley, Kelly was appointed to represent Plaintiff by the San Diego County Superior for the city of EL Cajon on    MARCH, 1995. Counsel Kelley acts and omission before trial and during trial Constitute an extreme departure from the Ordinary standard of Conduct.

9.    In claims Two and Three, Plaintiff sues San Diego County and the City of El Cajon, Under 42 U.S.C. Section 1983, Contending Violations

1  of his constitutional rights to due process and a
2  fair trial. With respect to the county, Plaintiff contends
3  unconstitutional practices, and policies of inaction,
4  as well as reckless and/or callous indifference to
5  the federally protected right of others when failing
6  to train and supervise defense counsel Thomas Kelley

8  10.    In claim Four, and with all due respect to the
9  Alternative Public Defenders Office, this agency is just
10  as liable for counsel Kelley's reckless and Callous
11  indifference to Plaintiff's federally protected right to a
12  fair trial by their complete failure to supervise the
13  practices counsel Kelley and Omissions constitutes
14  "Policy of inaction".

16  11.    Judge Miller in his October 2020, order noted
17  that the magistrate Judge explained in relevent part that
18  in 1995 the applicable ABA Standard for Criminal
19  Justice required" defense Counsel.... conduct a prompt
20  investigation of the circumstances of the case and explore
21  all avenues leading to facts relevent to the merits of
22  the case and penalty in the event of conviction."
23  ( R&R at 27, Citing ABA standard for Criminal
24  Justice 4.4.1 (a) (3d ed. 1993)).

26  12.  With all this in mind, and on issues of liability,
27  Vicarious liability, with respect to Plaintiff's claim
28  of "Policy of inaction", that the county, City and the

1  Office of Alternate Attorney agency failed to supervise
2  the practices of counsel Kelley Conduct when violating
3  clearly established law when acting within the scope of
4  his employment.

5
6  13.   It is undisputed that counsel Kelley was acting
7  within the scope of his employment with the San Diego
8  County Superior Court in and for the City of El Cajon
9  at all relevent times, and for that reason the County, a
10  public entity, would be vicariously liable for counsel
11  Kelley negligent acts and omissions within the scope
12  of employment.

13
14  14.   In the instant action, Plaintiff submits that each
15  and every defendant named in this Complaint is subject
16  monetary and punitive damages in their individual and
17  offical capacities. Counsel Kelley in his individual
18  and offical capacities acted under color of state
19  law engaged in wanton and oppressive conduct by
20  his own acts and omissions.

21
22  15.   The claim against Counsel Kelley in his
23  offical capacity are in fact Public Defenders
24  office, public entities, are vicariously liadbe for
25  Counsel Kelley's Conduct, negligent acts and/or
26  omissions within the scope of employment.

27
28  16.   Wherefore, Plaintiff humbly prays that as a

Page 2d

1  Pro Se Litigant, the Court construe Plaintiff's Complaint
2  liberally, when evaluating Plaintiff's claims, and conclude on
3  its face that Plaintiff's complaint warrants appointment of
4  legal Counsel to advance and defend against each and
5  every defendants oppositions and/or Motions.

6

7                    Respectfully Submitted,

8

9

10

11        Attached and marked Exhibit "B" is Judge
12  Miller's October 19, 2020, Order, adopting the U.S.
13  Magistrate's R&R.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                    Page 2e

\* EXHIBIT "B"

1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT
9             SOUTHERN DISTRICT OF CALIFORNIA
10
11   CHRISTOPHER JONES,                    Case No.: 3:09-cv-1896 JM (MSB)
12                          Petitioner,
                                           ORDER (1) ADOPTING REPORT
13   v.                                    AND RECOMMENDATION;
                                           (2) REJECTING RESPONDENT'S
14   MATTHEW CATE,                         OBJECTIONS; (3) GRANTING IN
15                          Respondent.    PART THE FIRST AMENDED
                                           PETITION FOR WRIT OF HABEAS
16                                         CORPUS
17
18        Christopher Jones ("Petitioner") is a state prisoner who originally filed a *pro se*
19   Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C.
20   § 2254.  (Doc. No. 1.)  Following remand from the Ninth Circuit, a First Amended Petition
21   for Writ of Habeas Corpus ("FAP") was filed on January 16, 2016.  (Doc. No. 141).  The
22   matter was referred to United States Magistrate Judge Michael S. Berg pursuant to
23   28 U.S.C. § 636(b)(1)(B).  Magistrate Judge Berg issued a Report and Recommendation
24   ("R & R") recommending the court grant the amended petition as to Claim One but deny
25
26
27
28

                                          1

1    it with respect to the Second Claim.  (Doc. No. 176 at 39.[1])  Respondent filed Objections

2    to the R & R.  (Doc. No. 36.)

3        Following *de novo* review of Petitioner's claims, the court finds the R & R to be

4    thorough, complete, and an accurate analysis of the legal issues presented in the amended

5    petition.  For the reasons explained below, the court: (1) adopts the R & R in full; (2) rejects

6    the Respondent's objections; (3) grants the FAP as to Claim One; and (4) denies the FAP

7    as to Claim Two.

8    **I.**       **BACKGROUND**

9    **A. Factual Background**

10       The R & R contains an accurate recital of the facts as determined by the California

11    Court of Appeal, and the court fully adopts the R & R's statement of facts.  However, in

12    order to provide context, the court will repeat the summary compiled by Magistrate Judge

13    Berg from the "Facts" section of the California Court of Appeal opinion:

14         Jones lived with his wife and children in an apartment in a neighborhood
         where people commonly sought to show their toughness by making threats.

15         Jones knew [Michael Anthony] High ["High"] from the neighborhood.  Jones

16         did not act as if he were afraid of High.

17         On one occasion, while Jones was working on a truck, High played with a

18         revolver and said to Jones, "You would never know if I come up and shoot

19         [sic] you, would you?"  On another occasion, while Jones was emptying trash,
         High said to Jones, "I could have struck you, could have just … stabbed you."

20         High did not act on those threats.

21         On a later occasion about 8 p.m. on January 11, 1995, High and Mark

22         Robinson arrived at Jones's apartment and knocked loudly on the front door.

23         Jones went to an upstairs window and asked who was there.  Robinson said,
         "It's me, blood."[2]  Jones went downstairs and opened the door.  Robinson told

24

25

---

26    [1] Document numbers and page references are to those assigned by CM/ECF for the docket

27    entry.

28    [2] In the neighborhood, the term "blood" meant friend.

1
2

Jones, "Get my money." Jones told Robinson he would be the first to know when Jones got Robinson's money. Robinson walked away.

3
4
5
6
7

Asking Jones about a rumor that Robinson made sexual advances toward the girlfriend of another man, High said, "What is up with that he-said-she-say-shit?" High opened the screen door and began pulling on Jones. Jones extricated himself and pushed High outside. Jones's wife said, "Shoot him." As High tried to enter the apartment, Jones again pushed him outside. Remaining outside, High yelled at Jones to come outside and shouted obscenities about Jones's wife.

8
9
10

Angered, Jones went outside where he and High swung at each other but missed. Jones then pulled a gun from his pocket and shot into the air. High ducked and rolled to the ground. As High rolled on the ground, Jones chased High and shot him.

11
12
13
14
15
16

Trying to run away, High hopped over two fences. Jones chased High and fired another shot. High's back arched, his arms went back, and his chest thrust forward as he fell face first into the street having been shot in the back. When High rolled over onto his back in the street, Jones approached and stood over him. Standing less than a foot from High, Jones shot him three times in the face.[3] Although High was still breathing, Jones walked away from him without offering medical assistance or seeking to summon an ambulance. Jones then rode away on a bicycle.

17

Paramedics arriving at the scene did not find any weapons on High's person.

18
19

On January 13, 1995, about 7 p.m., High died from multiple gunshot wounds.

20
21
22

On January 26, 1995, a deputy sheriff searched Jones's apartment and found a gun. A comparison of the bullets fired from Jones's gun and four missile fragments removed from High's body was inconclusive but indicated High could have been shot with Jones's gun.

23

R & R at 6-7; (*see also* Doc. No. 10-3 at 2-4).

24
25
26
27
28

[3] The Court notes that although the Court of Appeal opinion states that petitioner shot High three times in the face, the evidence presented at trial and the arguments contained in the FAP and Answer Memorandum indicate that Petitioner only shot High twice in the face. (*See* Doc. No. 141 at 6, 8, 14; Doc. No. 152-1 at 6; Doc. No. 10-11 at 174-75; Doc. No. 10-12 at 107.)

3

**B. State Procedural Background**

The R & R contains a complete and accurate summary of the state court proceedings, and the court fully adopts the R & R's statement of state procedural background.

**C. Federal Procedural Background**

An accurate history of the legal proceedings between the filing of the original pro se Petition for Writ of Habeas Corpus and the issuance of Magistrate Judge Berg's R & R on the FAP is set forth within it at pages 1-4, so the court need not repeat them here. The court fully adopts the R & R's statement of the federal procedural background preceding the R & R's issuance and the interceding state court procedures.

The FAP, filed on January 16, 2016, challenges Petitioner's San Diego County Superior Court conviction for second degree murder. (Doc. No. 141.) Petitioner alleges two ineffective assistance of counsel claims and an instructional error claim[4], while conceding the two ineffective assistance of counsel claims were not presented to the state courts. Claim One alleges that trial counsel provided ineffective assistance by not investigating and presenting a mental-health based defense. Claim Two alleges trial counsel provided ineffective assistance by not moving to have Petitioner declared incompetent to stand trial. After Petitioner exhausted his state court remedies and returned to this court, Respondent filed his answer to the FAP on September 22, 2019. (Doc. No 152, 152-1.) On October 16, 2017, Petitioner filed a Traverse. (Doc. No. 154.)

Following several status conferences, an evidentiary hearing was set for February 6, 2019, to help decide Petitioner's ineffective assistance of counsel claims on the merits. (Doc. Nos. 157, 159, 166, 171, 172.) The parties subsequently submitted several stipulations regarding the admissibility of evidence and the testimony of trial counsel, and Magistrate Judge Berg vacated the evidentiary hearing and took the matter under submission. (Doc. No. 175.)

---

[4] Petitioner conceded that his instructional error claim failed on the merits, therefore, it was not addressed in the R & R. *See* R & R at 2.

1   On January 21, 2020, Magistrate Judge Berg issued an R & R which recommended
2   the FAP be denied as to Claim Two.  (R & R at 39.)  With respect to Claim One, it was
3   recommended that:

> Petitioner shall be discharged of all consequences of his second degree murder
> conviction in San Diego Superior Court Case No. ECR11253 unless either
> (a) he is brought to trial and retried on the second degree murder charge within
> sixty (60) days or such additional time as state law allows, or (b) the
> judgement of conviction in San Diego Superior Court Case No. ECR11252 is
> reduced from second degree murder to manslaughter and petitioner is
> resentenced accordingly (including on the personal use of a firearm
> enhancement) with credit for time served.

10   R & R at 39.

11   On March 5, 2020, after being granted an application for enlargement of time,
12   Respondent filed his Objections. (Doc. No. 179). Within his objection, Respondent argues
13   that the magistrate judge erred in not adequately deferring to the reasonable tactical
14   decisions of counsel. Relatedly, Respondent asserts that Petitioner has not met his burden
15   of showing that counsel's performance was deficient nor has Petitioner demonstrated that
16   the alleged deficient performance resulted in prejudice.

17   Petitioner did not object to the magistrate judge's recommendation that the court
18   deny relief on Claim Two.

19   **II.   DISCUSSION**
20   **A. Legal Standard**
21   The R & R sets forth the correct standard of review for a petition for writ of habeas
22   corpus. 28 U.S.C. § 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

5

1        (2) resulted in a decision that was based on an unreasonable determination of

2        the facts in light of the evidence presented in the State court proceeding.

3   28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 403, 123-13 (2000).

4       By virtue of there being no state court adjudication of the merits of the two

5   ineffective assistance of trial counsel claims, the governing standard of review for those

6   claims is *de novo*. *See Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003) (the

7   deferential standard of the Antiterrorism and Effective Death Penalty Act ("AEDPA") does

8   not apply when the state court does not issue a decision on the merits); *Pirtle v. Morgan*,

9   313 F.3d 1160, 1167 (9th Cir. 2002) ("[W]hen it is clear that a state court has not reached

10   the merits of a properly raised issue, we must review it de novo."); *see also, e.g., Williams*

11   *v. Ryan*, 623 F.3d 1258, 1264 (9th Cir. 2010) (where denial of state court claim is on

12   inadequate procedural ground, "[t]he deference AEDPA requires for state court

13   determinations … does not apply and [federal court] review of [the] claim is de novo").

14   **B. Analysis of Petitioner's Claims**

15       Petitioner raises two claims in his FAP, both based on purported violations of his

16   Sixth Amendment constitutional right to effective assistance of counsel. Specifically, he

17   claims: (1) ineffective assistance of counsel based on trial counsel's failure to investigate

18   and present a mental-health based defense (FAP at 27-34); and (2) ineffective assistance

19   of counsel based on trial counsel's failure to move to have Petitioner declared incompetent

20   to stand trial (*id.* at 43-46).

21       To successfully make an ineffective assistance of counsel claim, Petitioner must

22   show that counsel's performance was deficient and that the deficiency prejudiced the

23   defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1994). As Magistrate Judge Berg

24   explained, this requires Petitioner demonstrate "counsel made errors so serious that counsel

25   was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"

26   and the deficient performance deprived defendant of "a fair trial, a trial whose result is

27   reliable." *Id.* at 687. In other words, Petitioner must demonstrate "the challenged action

28

1    cannot be reasonably considered sound trial strategy under the circumstances of the case."

2    *Lord v. Wood.*, 184 F.3d 1083, 1085 (9th Cir. 1999).

3        Additionally, Petitioner must establish "that there is a reasonable probability that,

4    but for counsel's unprofessional errors, the result of the proceeding would have been

5    different. A reasonable probability is a probability sufficient to undermine confidence in

6    the outcome." *Strickland,* 466 U.S. at 694.

7        "Failure to satisfy either prong of the *Strickland* test obviates the need to consider

8    the other." *Rios v. Rocha,* 299 F.3d 796, 805 (9th Cir. 2002). *See also Strickland*, 466 U.S.

9    at 697 ("If it is easier to dispose of an ineffectiveness claim on the grounds of lack of

10   sufficient prejudice, … that course should be followed.").

11       **1. Claim One: Trial Counsel Provided Ineffective Assistance of Counsel by
        Not Investigating and Presenting a Mental-Health Based Defense.**

12

13       Petitioner argues that his Sixth Amendment right was violated by the ineffective

14   assistance he received when his trial counsel, Kelley, failed to investigate, and then present,

15   a mental-health based defense at trial. (FAP at 26.) Petitioner asserts that Kelley

16   performed deficiently by failing to investigate his mental health when the facts Kelley

17   knew or should have known, along with statements made by himself and his family

18   members, medical, educational and court records, and the crime itself, raised the possibility

19   of a mental-health-based defense. (*Id.* at 26-31.) Further, Petitioner claims he was

20   prejudiced by trial counsel's decision to not present a mental-health based defense. In

21   Petitioner's view, Kelley went to trial on a weak self-defense claim and he contends, if

22   Kelley had presented a mental-health defense, the jury's understanding of the case would

23   have fundamentally changed. (*Id.* at 31-34.)

24       In his objections, Respondent states that the magistrate judge was mistaken in failing

25   to adequately defer to the reasonable tactical decisions of counsel based on what counsel

26   knew at the time. (Doc. No 179 at 5.) Respondent argues that Petitioner has not met his

27   burden to either show that Counsel's performance was deficient or resulted in prejudice.

28

7

1   (*Id.* at 6-15.)  However, the court agrees with Magistrate Judge Berg that Petitioner has met

2   his burden of demonstrating both.

3        As correctly noted by Magistrate Judge Berg, "counsel has a duty to make reasonable

4   investigations or to make a reasonable decision that makes particular investigations

5   unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must

6   be directly assessed for reasonableness in all the circumstances, applying a heavy measure

7   of deference to counsel's judgments." *Id.* Whether counsel's actions are reasonable "may

8   be determined or substantially influenced by the defendant's own statements or actions."

9   *Id.* The Supreme Court has provided some guidance on the subject by furnishing the

10   following examples:

11        when the facts that support a certain potential line of defense are generally
        known to counsel because of what the defendant has said, the need for further

12        investigation may be considerably diminished or eliminated altogether.  And
        when a defendant has given counsel reason to believe that pursuing certain

13        investigations would be fruitless or even harmful, counsel's failure to pursue
        those investigations may not later be challenged as unreasonable.

14

15   *Id.*

16        Moreover, the Ninth Circuit has cautioned that "a tactical decision may constitute

17   constitutionally adequate representation even if, in hindsight, a different defense might

18   have fared better." *Bemore v. Chappell*, 788 F.3d. 1151, 1163 (9th Cir. 2015) (citing

19   *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995). Thus, determining "[w]hether

20   performance was deficient is a fact-specific inquiry; '[n]o particular set of detailed rules

21   for counsel's conduct can satisfactorily take account of the variety of circumstances faced

22   by defense counsel or the range of legitimate decisions regarding how best to represent a

23   criminal defendant.'" *Id.* (quoting *Strickland*, 466 U.S. at 688-89). Prevailing professional

24   norms can provide insight into what it means to provide reasonably competent assistance.

25   *See id.* The Restatement of Professional Standards can be a useful guide for determining

26   reasonableness "to the extent they describe the professional norms prevailing when the

27   representations took place." *Doe v. Ayers*, 782 F.3d 425, 434 (9th Cir. 2015) (citation

28   omitted).

1    As Magistrate Judge Berg explained, in 1995 the applicable ABA Standards for

2 Criminal Justice required "[d]efense counsel . . . conduct a prompt investigation of the

3 circumstances of the case and explore all avenues leading to facts relevant to the merits of

4 the case and the penalty in the event of conviction." (R & R at 27 citing *Brodit v. Cambra*,

5 350 F.3d 985, 1006 (9th Cir. 2003) (citing ABA Standards for Criminal Justice 4-4.1(a)

6 (3d ed. 1993)). "The commentary to the standards made clear that 'information concerning

7 the defendant's background, education, employment record, mental and emotional

8 stability, family relationships, and the like will be relevant....'" *Ayers*, 782 F.3d at 434

9 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 7-8 (2009)).

10    **i.    Analysis**

11    Petitioner was convicted of second degree murder.   As Magistrate Judge Berg

12 accurately detailed, in California "[s]econd degree murder is the unlawful killing of a

13 human being with malice aforethought but without the additional elements, such as

14 willfulness, premeditation, and deliberation, that would support a conviction of first degree

15 murder." *People v. Elmore*, 59 Cal. 4th 121, 133 (2014) (quoting *People v. Knoller*, 41 Cal.

16 4th 139, 151 (2007)).[5]   "Two factors may preclude the formation of malice and reduce

17 murder to voluntary manslaughter: heat of passion and unreasonable self-defense."

18 *Elmore*, 59 Cal. 4th at 133.  "'[O]ne who holds an honest but unreasonable belief in the

19 necessity to defend against imminent peril to life or great bodily injury does not harbor

20 malice and commits no greater offense than manslaughter.'" *Id.* at 134 (quoting *People v.*

21 *Flannel*, 25 Cal. 3d 668, 672 (1979)).   Unreasonable self-defense is based on a defendant's

22

23

24 [5] Malice aforethought may be express or implied.   *Elmore*, 59 Cal. 4th at 132.   Express
malice means that a defendant "must intend to act unlawfully, or in other words, have a

25 wrongful intent."   *Id.* at 133.   "Malice is implied when an unlawful killing results from a
willful act, the natural and probable consequences of which are dangerous to human life,

26 performed with conscious disregard for that danger."   *Id.* (citing CAL. PENAL CODE § 188)

27 "Manslaughter, a lesser included offense of murder, is an unlawful killing without malice.
*Id.* (citing CAL. PENAL CODE § 192; *People v. Thomas*, 53 Cal. 4th 771, 813 (2012)).

28

1  assertion that he lacked malice and acted on the belief that he needed to defend himself.

2  *Id.* at 136.  *See also In re Christian S.*, 7 Cal. 4th 768, 771 (1994) ("Under the doctrine of

3  imperfect self-defense, when the trier of fact finds that a defendant killed another person

4  because the defendant actually, but unreasonably, believed he was in imminent danger of

5  death or great bodily injury, the defendant is deemed to have acted without malice and thus

6  can be convicted of no crime greater than voluntary manslaughter.").

7        Here, while Petitioner conceded that he killed the victim, his counsel sought to

8  establish and argue imperfect self-defense to the jury.[6]  Ordinarily, a defendant may present

9  "evidence of mental disease, defect, or disorder to support a claim of unreasonable self-

10  defense based on mistake of fact." *Elmore,* 59 Cal. 4th at 146.  But Petitioner argues that

11  Kelley never investigated his state of mind, including his mental-health struggles.

12                        **ii.    Petitioner met his burden of showing deficient performance**

13        Petitioner contends that Kelley's performance was deficient because a reasonable

14  investigation into any potential defense would have revealed his mental-health issues, and

15  that Kelley was on 'notice' of his serious mental-health issues. (FAP at 28-29.)  Petitioner

16  argues that Kelley "never investigated [Petitioner's] mental health and whether his mental

17

18

_____

19  [6] Because imperfect self-defense involves a misperception of objective circumstances, it is

20  unlike diminished capacity and "is not rooted in any notion of mental capacity or awareness
   of the need to act lawfully." *Elmore,* 59 Cal. 4th at 134-35.  The California Supreme Court

21  has explained the difference as:

22

23        A defendant who makes a factual mistake misperceives the objective
         circumstances.  A delusional defendant holds a belief that is divorced from

24        the circumstances.  The line between mere misperception and delusion is
         drawn at the absence of an objective correlate.  A person who sees a stick and

25        thinks it is a snake is mistaken, but that misinterpretation is not delusional.
         One who sees a snake where there is nothing snakelike, however is deluded.

26        Unreasonable self-defense was never intended to encompass reactions to

27        threats that exist only in the defendant's mind.

28  *Elmore,* 59 Cal. 4th at 137.

                                                10

1    health (exacerbated by his drug use) might have contributed to [Petitioner] having a

2    genuine, albeit unreasonable, belief in the need to defend himself from High." (*Id.* at 29-

3    30.) Further, Petitioner argues Kelley's decision not to conduct an investigation into a

4    client's mental health cannot be viewed as reasonable, especially when that client was

5    showing signs of mental-health issues. (*Id.* at 30.)

6          The Ninth Circuit has cautioned that, "'the Supreme Court has repeatedly made plain

7    that counsel has the "duty to make reasonable investigations or to make a reasonable

8    decision that makes particular investigations unnecessary.'" *Weeden v. Johnson*, 854 F.3d

9    1063, 1069 (9th Cir. 2017) (internal citations omitted) "Trial counsel has a duty to

10   investigate a defendant's mental state if there is evidence to suggest that the defendant is

11   impaired." *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003).

12         In the case at bar, the record regarding what, if any, investigation Kelley performed,

13   is sparse. As Magistrate Judge Berg explained, "[t]he parties' stipulation as to Mr. Kelley's

14   testimony sheds no further light on Kelley's actual decision making in Petitioner's case."

15   (R & R at 30; *see also* Doc. No. 173). The record does, however, make clear that a mental

16   health defense was possibly available, yet Kelley did not investigate that defense. *See*

17   *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (in light of the potentially exculpatory

18   psychological evidence, counsel's failure to investigate "ignored pertinent avenues for

19   investigation of which he should have been aware."); *see also Phillips v. Woodford*,

20   267 F.3 966, 976 (9th Cir 2001).

21         The record illustrates that neither the defense investigator nor trial counsel ever

22   interviewed any potential witnesses regarding Petitioner's history of mental health issues

23   or drug abuse. (*See* FAP, Ex. A at A20, A30, A41.) The available record also reveals that

24   aside from interviewing Petitioner's wife, Joyce Ann Richmond, (*see id.* at A18-21), no

25   members of the defense team made any effort to visit and interview Petitioner's family

26   members and friends in an attempt to obtain information on Petitioner's background and

27   upbringing. (*See id.* at A29-30, A31-32, A40-41.) This conclusion is supported by

28   Kelley's own testimony, wherein he stated that "typically, he did not care what the

1  defendant or family member said because he knew what his job was in defending a case."
2  (Doc. No. 173 at 3.)  Similarly, it does not appear that any effort was made to gather school
3  records about Petitioner.  Had anyone bothered to do so, they would have learned about
4  Petitioner's history of childhood abuse, that he struggled in school and failed second
5  grade[7], with subsequent testing revealing that Petitioner has an IQ of 57, placing him
6  squarely in the mentally retarded range.  (FAP, Ex. C at C2, C67.)  All this information
7  would have been highly relevant at both phases of Petitioner's trial.

8       Moreover, the available record shows little, if any, investigation regarding
9  Petitioner's drug addictions, or any record of his mental health history since childhood or
10 adolescence.  The only indication that Kelley considered Petitioner's drug use is a notation
11 indicating the defense investigator consulted with Dr. Ornish, who holds a "Diplomate
12 American Board of Psychiatry and Neurology with Added Qualifications in Forensic
13 Psychiatry," for one-hour regarding methamphetamines.  (Doc. No. 173 at 3.)  Kelley
14 himself recently declared he "has no recollection of Dr. Ornish," although he does "recall
15 that there was some information that Jones had a history of drug use." (*Id.* at ¶ 15.)  In his
16 objections, Respondent contends Kelley had a practice of considering mental health
17 defenses as part of a murder case because it might reduce culpability and the consultation
18 between the defense investigator and Dr. Ornish "confirm[s] that mental health issues
19 relating to a possible mental health defense were necessarily explored and considered, and
20 thus counsel was not deficient."  (Doc. No. 179 at 7).  But as Magistrate Judge Berg
21 explained, these records do not suggest "that Mr. Kelley consulted with Dr. Ornish about

22

23

_____

24 [7] As the declaration filed in support of the FAP from Dr. Gregory Woods notes, Petitioner's
25 "academic records are consistent with a life-long, developmental course of cognitive
   deficits, consistent with an impaired brain long before he became involved in drug use or
26 came to prison." (FAP, Ex C at C2, ¶ 4.)  Similarly, Dr. Stacey Wood reports Petitioner
27 "presents with an IQ of 57, in the mildly intellectually disabled range (formerly known as
   mildly mentally retarded).  This IQ score is in the 0.2nd percentile, meaning it is worse
28 than 99.8% of the population." (*Id.* at C25, ¶ 3.)

1    any other aspect of Petitioner's mental condition at the time of the shooting or that Dr.

2    Ornish ever interviewed Petitioner about his mental health history." (R & R at 34.)

3          Within the same declaration, Mr. Kelley also stated that he was unaware of

4    Petitioner's mental health issues, that he suffered from schizophrenia or that he was on

5    medication, asserting he "never got any of that from Mr. Jones." (Doc. No 173 at ¶ 12.)

6    Kelley's position is directly contradicted by Petitioner's own declaration that he informed

7    Kelley that he had been hearing and seeing things on the day he shot the victim, and that

8    he was on "psych" medications during his meetings with Kelley because he was still

9    hearing voices and seeing things. (*See* FAP Ex. A at A47.) Even if the court views

10   Petitioner's statement as self-serving, Kelley's declaration is especially troubling when one

11   considers that Kelley was aware that while awaiting trial, Petitioner had been held in a

12   padded "safety" cell at the George Bailey Detention Facility and had been prescribed the

13   antipsychotic drug, Mellaril. (*See* FAP Ex. B at B3, B9, B27, B29, B30.) Respondent's

14   contention that Kelley likely disregarded Petitioner's mental-health issues because Kelley

15   chose to accept a prison nurse's diagnosis that Petitioner was "malingering," and that

16   Petitioner did not complain to prison officials again about mental health issues while

17   awaiting trial, (Doc. No. 179 at 10-11; *see also* FAP Ex B. at B13), does not excuse Kelley

18   from his duty to investigate and provides further evidence as to why his decision not to

19   explore further was unacceptable. *See Ayers*, 782 F.3d at 435 ([I]f what counsel knows or

20   should know suggests that further investigation might yield more mitigating evidence,

21   counsel must conduct that investigation.)

22         Mental health professionals, including prison medical officials and Respondent's

23   expert, Dr. A. Martell, Ph.D., ABPP, (*See, e.g.,* FAP, Ex. C, C65, C70-74; ECF 165-1),

24   have since determined that Petitioner has legitimate mental-health issues and a long history

25   of psychiatric issues.[8]   According to Dr. Gregory Woods, hired by habeas counsel,

26

27   _____

28   [8] As Magistrate Judge Berg documented, the parties stipulated that the expert reports, "with
     the exception of Dr. Woods's ultimate conclusion that [Petitioner] in fact had a genuine,

1   Petitioner is diganosed with: Cognitive Disorder not otherwise specified; psychotic
2   disorder secondary to a general medical condition; post-traumatic stress disorder;
3   methamphetamine abuse in remission; and global cognitive impairments. (*Id.* at C2, ¶ 7.)
4   Dr. Woods notes Petitioner suffers from several psychiatric conditions including
5   schizoaffective disorder, schizophrenia, bipolar disorder, and major depressive disorder.
6   (*Id.* at C2, ¶ 8.) Dr. Woods also reports that there was a genuine possibility that Petitioner
7   was perseverating when he killed High, which is the uncontrollable repletion of a response
8   to a stimulus that is often caused by a brain injury or organic brain disorder. (*Id.* at C68.)
9   He opines:

> Mr. Jones suffers from significant deficits in his executive functioning. This
> impacts his ability to effectively weigh and deliberate, sequence his thinking
> and behavior, and causes him to get stuck. Mr. Jones has demonstrated
> concrete thinking and disinhibition. At times he seems unable to respond in
> a reasonable manner. His reactions were honest, but unreasonable. His
> cognitive deficits are captured in his testimony and corroborated by his social
> history and neuropsychological testing.

15   *Id.* at C75. Additionally, Dr. Woods submits that Petitioner's cognitive deficits were
16   compounded by his methamphetamine use which enhanced his paranoia. (*Id.* at C69.)
17   Similarly, Dr. Daniel A. Martell reviewed and agreed with Dr. Stacey Wood's conclusions
18   that Petitioner meets diagnostic criteria for Intellectual Disability and suffers from
19   neuropsychological impairments in multiple areas including executive functioning,
20   memory, attention and visual processing. (Doc. No. 165-1 at 2.) Further, Dr. Martell
21   agrees with Dr. George Woods's conclusion that Petitioner has a history of suffering from
22   mental illness, including schizophrenia, schizoaffective disorder, depression, and PTSD,
23   and with Dr. Woods's opinion that Petitioner's chronic methamphetamine use would have
24   further served to undermine his intellectual and cognitive deficits, potentially exacerbating

27   albeit unreasonable, belief in the need to defend himself. That conclusion can be found at
      Exhibit C65 and C73. This Court, however, can consider Dr. Woods's opinions that led
28   him to that conclusion." (Doc. No. 174 at 2-3.)

14

1    his psychiatric symptoms. (*Id.* at 2-3.) Finally, Dr. Martell opines that Dr. Woods's finding

2    that Petitioner's behavior during the instant offense reflected frontal lobe dysfunction and

3    "perseveration," while speculative, is not out of the realm of possibility and as such may

4    have been helpful to the trier-of-fact at trial. (*Id.* at 3.) Thus, as Magistrate Judge Berg

5    outlined, "both Petitioner's mental expert (Dr. Woods) and Respondent's expert (Dr.

6    Martell) are in accord that the defense of imperfect self-defense also was potentially

7    available based on Petitioner's mental condition at the time of the shooting," (R & R at

8    31.) These concurring opinions underscore the objective unreasonableness of Kelley's

9    failure to investigate Petitioner's mental history and mental condition at the time of the

10   shooting, explore the possibility of presenting a mental-health based defense, or present

11   one at trial.

12         Finally, Respondent contends Magistrate Judge Berg did not adequately consider the

13   information known to counsel at the time of trial and that this information informed

14   Kelley's decision regarding whether a mental health defense was worth further pursuing.

15   (Doc. No. 179 at 8.) Specifically, he points to Kelley's ability to hear the recording of the

16   statement Petitioner gave to the police two weeks after the shooting, claiming it provides a

17   justification for the discounting of the need to investigate a mental health defense.

18   According to Respondent, "[a]t least by a cold reading of the transcript, no mental disorder

19   was apparent in light of Petitioner's detailed recall of the incident, his ability to coherently

20   answer questions, and most tellingly, the absence of any claim of hallucinations, paranoia,

21   or symptom of psychosis." (*Id.* at 9.) Respondent also points to the absence of any

22   reference to Petitioner's mental health problems or methamphetamine use in the statements

23   his wife gave to the police, and to a probation officer when compared to the declaration

24   she supplied to this court. (*Id.* at 9-10.) Additionally, Respondent argues that Petitioner's

25   pretrial, trial and post-trial testimony make no reference to paranoia, hallucinations, or give

26   any indication that he was not in his right mind at the time of the killing. (*Id.* at 12-13.)

27   But as *Strickland* and its progeny make clear, counsel's investigation must determine

28   strategy and not the other way around. *See Wiggins v. Smith,* 539 U.S. 510, 521 (2003)

1    (The "deference owed [to] strategic judgments" to pursue one trial strategy and not an

2    alternative is "defined ... in terms of the adequacy of the investigations supporting those

3    judgments."). *See also, e.g., Weeden*, 854 F.3d at 1070 ("Counsel cannot justify a failure

4    to investigate simply by invoking strategy. The Supreme Court has squarely rejected the

5    attempt to justify a limited investigation as reflecting a tactical judgment.") (internal

6    quotations and citations omitted). As discussed, Kelley failed to make a reasonable

7    investigation into Petitioner's mental health issues and history of drug use. By not

8    investigating the contours of a potential mental health defense, Kelley was not able to

9    determine if the defense was viable, or, whether it was more promising than the alternate

10   imperfect self-defense theory. Therefore, his decision not to put on a mental health defense

11   cannot be considered a product of a strategic decision because, "[a]n uninformed strategy

12   is not a reasoned strategy. It is, in fact, no strategy at all." *Correll v. Ryan*, 539 F.3d 938,

13   949 (9th Cir. 2008).

14          Petitioner has demonstrated that Kelley's decision to not pursue a possible mental

15   health defense was based on an inadequate investigation, and that the decision cannot be

16   considered strategic. *See Bemore* 788 F.3d at 1165-66 (counsel's choice to not present a

17   defense can "hardly be said to [be] a strategic choice" worthy of deference when "s/he has

18   not yet obtained the facts on which such a decision could be made.") (internal citations

19   omitted). Most, if not all, of the information outlined above was readily available to Kelley

20   at the time and reveals the possibility that Petitioner was so mentally impaired as to be

21   unable to possess the requisite intent to commit the crimes. *See Wiggins*, 539 U.S. at 521.

22   Accordingly, the court concludes that counsel's performance was deficient because he

23   failed to investigate petitioner's mental health, a failure highlighted by his later inability to

24   justify not considering it. Thus, the court agrees with Magistrate Judge Berg that Petitioner

25   met his burden of showing deficient performance.

26          ### iii.    **Petitioner met his burden of showing prejudice**

27          Under *Strickland*, prejudice is established when "it is 'reasonably likely' the result

28   would have been different." *Harrington v Richter*, 562 U.S. 86, 111-12 (2011). When a

1   petitioner claims counsel's error was a failure to investigate, demonstrating *Strickland*

2   prejudice requires showing both a reasonable probability that counsel would have made a

3   different decision had he investigated, and a reasonable probability that the different

4   decision would have altered the outcome. *Bemore,* 788 F.3d at 1169 (citing *Wiggins* 539

5   at 535-36).

6          To prevail on a mental health defense, Petitioner "would have to prove either that

7   'because of his mental illness or voluntary intoxication, he did not in fact form the intent

8   unlawfully to kill.'" *Bemore,* 788 F.3d at 1169 (quoting *The People v. Saille*, 54 Cal. 3d

9   1103, 1117 (1992)).

10         The evidence supporting a mental health defense Petitioner offers includes expert

11  testimony from Dr. Gregory Woods and Dr. Stacey Wood outlining the serious mental

12  health issues he was suffering at the time of the offense, including a cognitive disorder,

13  life-long psychotic symptoms, and methamphetamine-related psychosis.   As Magistrate

14  Judge Berg reported:

15         these disorders not only clouded Petitioner's thinking, but some had led him
           since childhood to hear and see things that were not there; that Petitioner
16         suffered from profound cognitive dysfunction (i.e., that his brain was
           tragically damaged and had been since his childhood); that Petitioner
17         consequently "perseverates"- he "gets stuck on a word or idea," meaning he
18         struggles to move on from a stimulus once it ceases and also struggles to
           quickly process changing circumstances; and that Petitioner's judgment and
19         thought process would have been further clouded from the methamphetamine
20         he had been using for the preceding ten days.

21

22  R & R at 37. Such defense expert testimony "would have added an entirely new dimension

23  to the jury's assessment" of the critical issue of Petitioner's mens rea. *Weeden*, 854 F.3d

24  at 1070, 1072 (finding expert testimony regarding the effect of the defendant's youth would

25  have added an "entirely new dimension to the jury's assessment" of the defendant's mental

26  condition and its decision regarding whether she had the requisite mens rea.)  Here, as

27  Petitioner suggests, a mental health defense "would have given the jury the compelling

28  reason why Mr. Jones (unlike a typical person) could have genuinely, though unreasonably,

1   believed that a man lying on the ground with a bullet in his back posed a threat." (Doc.

2   No. 180 at 33.)

3       Not only is Petitioner's argument persuasive, Respondent's expert, Dr. Martell,

4   concluded to a reasonable degree of psychological certainty that Dr. Woods's "finding that

5   [Petitioner's] behavior during the instant offense reflected frontal lobe dysfunction and

6   'perseveration' while speculative, is not out of the realm of possibility and as such may

7   have been helpful to the trier-of fact at trial." (Doc. No. 165-1 at 3.)  Finally, Petitioner

8   has provided declarations from family members attesting to his lifelong history of hearing

9   and seeing things. (*See* FAP, Ex. A14, A18-20, A31-32, A40-41.)  Taken together, this

10   evidence of Petitioner's mental health and drug issues could have been used by an attorney

11   to raise reasonable doubt about Petitioner's ability to form the requisite intent to justify a

12   second-degree murder conviction. *See Jennings v. Woodford*, 290 F.3d 1006, 1019 (9th

13   Cir. 2001) (defendant prejudiced by counsel's failure to undertake an appropriately diligent

14   investigation and not opt for a mental health defense strategy, and concluding that it was

15   reasonably probable that had evidence of mental health and drug abuse been introduced, it

16   would have raised reasonable doubt as to his ability to form the intent required for a murder

17   conviction); *Elmore*, 59 Cal. 4th 121, 325 P.3d at 958, 960-61 (petitioner misperceived

18   "objective circumstances" because of a mental illness, cognitive dysfunction, and drug

19   use). As explained in the R & R:

20          but for Mr. Kelley's deficient performance in failing to investigate and present

21          a mental-health based defense, there is a reasonable probability that at least
            one juror would have been persuaded that Petitioner only was guilty of

22          manslaughter based on an imperfect self-defense theory as opposed to second

23          degree murder.

24   R & R at 39.

25       Based on a review of the record and the materials proffered by Petitioner in support

26   of a mental health defense, the court is persuaded that there is "a reasonable probability

27   that, but for counsel's unprofessional errors" in failing to present this defense at trial, "the

28   result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. *See also*

1    *Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just

2    conceivable.").

### iv.    Conclusion regarding Claim One

4          In sum, Petitioner has overcome *Strickland's* high bar and demonstrated that his trial

5    counsel's failure to conduct an adequate investigation or present a mental-health based

6    defense, was unreasonable. Further, Petitioner has demonstrated that he suffered sufficient

7    prejudice to warrant setting aside his sentence.    Accordingly, the court rejects the

8    Respondent's objections, adopts the R & R, and grants the petition as to Claim One.

### 2. Claim Two: Trial counsel provided ineffective assistance by not moving to have Petitioner declared incompetent to stand trial.

11         Petitioner's second claim argues that he received ineffective assistance of counsel

12   because Kelley failed to move to have him declared incompetent to stand trial. (FAP at

13   43-46.) First, he contends there were multiple "flashing red signs" that no reasonable

14   attorney should have missed that illustrated Petitioner was not competent to stand trial.

15   Second, Petitioner claims there is overwhelming evidence to support his contention that

16   his mental health issues, methamphetamine use, and cognitive dysfunction subjected him

17   to serious limitations at the time of trial, leaving him unable to reasonably assist Kelley in

18   his defense.  In support of Claim Two, Petitioner primarily relies on the report of Dr.

19   Woods. (FAP, Ex. C at C73-74.)

20         A defendant is competent to stand trial if he has "a rational as well as a factual

21   understanding of the proceedings against him," along with "sufficient present ability to

22   consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. U.S.*,

23   262 U.S. 402, 402 (1960) (per curiam); *see also Clark v. Arnold*, 769 F.3d 711, 729 (9th

24   Cir. 2014); *Deere v. Cullen*, 718 F.3d 1124, 1144 (9th Cir. 2013).  As Magistrate Judge

25   Berg explained, "[c]ompetence has a modest aim: It seeks to ensure that [the defendant]

26   has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*,

27   509 U.S. 389, 402 (1993). Moreover, as Magistrate Judge Berg accurately recounted, the

28   Ninth Circuit has considered the following factors when determining whether there was a

1   reasonable probability that the defendant would have been found incompetent: (1) the
2   reports of all the mental health experts; (2) the nature of personal interactions between the
3   defendant and the trial judge, to consider whether these showed lucid, appropriate
4   responses to questions and established the defendant's understanding of the proceedings
5   and ability to consult with counsel; (3) the actions and opinion of defense counsel regarding
6   defendant's competency; (4) whether the prosecutor believed the defendant to be
7   competent; (5) whether the facts of the crime suggested "someone out of touch with
8   reality;" and (6) whether the trial transcripts illustrate the defendant "actually understood
9   what was going on." *Deere* 718 F.3d at 1145-46.

10        As the R & R made clear, the trial transcripts clearly illustrate that Petitioner
11   understood what was occurring during the trial and provided no instances where Petitioner
12   disrupted the trial or acted in a peculiar manner. (R & R at 12-16, 18-19.) And, as
13   recounted in the R & R, Petitioner's police interviews provided further support for this
14   conclusion. (*Id.* at 17.) The R & R also noted the absence of any notations in the files of
15   Mr. Lester, the public defender originally appointed to represent Petitioner, Kelley, or
16   Petitioner's criminal history record indicating a concern regarding Petitioner's competency
17   to stand trial. (*Id.* at 19-20.) The R & R also considered the prosecutor's position regarding
18   Petitioner's competency to stand trial and drew the reasonable inference that no prosecutor
19   had ever appeared to doubt Petitioner's competency. (*Id.* at 21.)

20        Finally, Magistrate Judge Berg weighed all the retrospective mental health expert
21   reports and contemporaneous records before concluding that the he did not find the report
22   of Dr. Woods to be persuasive on the issue of Petitioner's competence. Relying on
23   Petitioner's contention that he became "increasingly paranoid" and "with[drew] from his
24   trial," (FAP, Ex. C at C74), and his own interpretation of Petitioner's trial testimony, (*id.*),
25   Dr. Woods opined that Petitioner was "unable to reasonably assist his attorney in his
26   defense at the time of his tr[ia]l." (*Id.* at C74.) However, Magistrate Judge Berg concluded:

27          First, Dr. Woods cherry-picks a small segment from Petitioner's trial
28          testimony, which as set forth above, overall demonstrates that Petitioner

clearly understood the nature and object of the proceedings against him. Petitioner testified coherently and spoke in complete, responsive sentences. He was also a reliable historian, spatially aware (e.g., he could easily identify issues and explain photographs and locations), and did not appear to have memory issues. In addition, Petitioner had a detailed recollection of the night of the shooting, and he set forth his specific version of the events. Moreover, throughout his testimony, Petitioner demonstrated that he understood what was happening at the trial and was able to follow the testimony of the other witnesses. Petitioner also was able to understand and follow the questions being asked, and demonstrated an understanding of nuance.

R & R at 25.

The court agrees with Magistrate Judge Berg's determination that "although the facts of the crime did suggest 'someone out of touch with reality,' in the Court's view it does not follow from this one <u>Deere</u> factor that Petitioner lacked the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." (Id.) Furthermore, this court concurs with Magistrate Judge Berg's conclusion that Petitioner has failed to make the requisite showing that he would have been found incompetent to stand trial had his trial counsel moved for such a declaration. The court, therefore, adopts the R & R and denies the FAP as to Claim Two.

## III.   CONCLUSION

In accordance with the above, the court hereby: (1) adopts the R & R in full; and (2) rejects Respondent's objections.

The Amended Petition for Writ of Habeas Corpus is **DENIED** as to Claim Two. The Amended Petition for Writ of Habeas Corpus is **GRANTED** as to Claim One. (Doc. No. 141.) Petitioner shall be discharged of all consequences of his second degree murder conviction in San Diego Superior Court Case No. ECR11253 unless either (a) he is brought to trial and retried on the second degree murder charge within sixty (60) days or such additional time as state law allows, or (b) the judgment of conviction in San Diego Superior Court Case No. ECR11253 is reduced from second degree murder to manslaughter and petitioner is resentenced accordingly (including on the personal use of a firearm enhancement) with credit for time served.

1   The parties shall file a joint status report with the court within 75 days of this order.

2   The Clerk of Court is directed to **CLOSE** this case.

3   IT IS SO ORDERED.

4   Dated:  October 19, 2020

5

6   Hon. Jeffrey T. Miller
    United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3:09-cv-1896 JM (MSB)

**III.    RELIEF YOU REQUEST** *(State exactly what you want the court to do for you. Do not use this space to state the facts of your claim.)*

Plaintiff seeks damages in the amount according to proof as a direct result of defendant's actions and inactions relating to Plaintiff's wrongful and/or unconstitutional state Conviction.

Plaintiff endured discomfort, loss of liberty or deprivation of society, Mental suffering, humiliation, emotional Trama, and was deprived of any means of earning a living for those additional years Plaintiff was incarcerated and on parole.

Plaintiff seeks an award of $1.5 million. Plaintiff sues for one million in Compensatory damages, and $500,000.°° in punitive damages from Defendants.

3

1    **IV.    DEMAND FOR JURY TRIAL** *(Would you like a trial by jury on all claims*

2        *pursuant to FRCP, Rule 38?)*

3                ☑ Yes        ☐ No

4

5    I declare under penalty of perjury that the foregoing is true and correct.

6        4-27-2021                           *Christopher Jones*

7    Date                                    Signature

8                                            CHRISTOPHER JONES

9                                            Printed Name

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28